| **Smartt v Ricketts-Holcomb** |
|:---:|
| 2026 NY Slip Op 30736(U) |
| February 27, 2026 |
| Supreme Court, Kings County |
| Docket Number: Index No. 501999/2023 |
| Judge: Consuelo Mallafre Melendez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------------X
NATASHA SMARTT and DEVON SMARTT, as
Administrators of the Estate of D.S., Deceased, NATASHA
SMARTT, Individually and DEVON SMARTT, Individually,

        Plaintiffs,

   -against-

LISA RICKETTS-HOLCOMB, M.D., MELISSA
PHILADELPHIA, M.D., GABRIEL TERBANCEA, M.D.,
ASMA AHMAD, M.D. and NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION (KINGS COUNTY MEDICAL
CENTER),

        Defendants.
------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 501999/2023
Mo. Seq. 1

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s: 31 – 59, 60 – 72, 74

Defendants Lisa Ricketts-Holcomb, M.D. ("Dr. Ricketts-Holcomb"), Melissa

Philadelphia, M.D. ("Dr. Philadelphia"), Gabriel Terbancea, M.D. ("Dr. Terbancea"), Asma

Ahmad, M.D. ("Dr. Ahmad"), and New York City Health and Hospitals Corporation

("NYCHHC"), sued herein as "New York City Health and Hospitals Corporation (Kings County

Medical Center"), move for an Order, pursuant to CPLR 3212, granting summary judgment in

their favor (Seq. No. 1).

Plaintiffs oppose the motion as to Dr. Ricketts-Holcomb, Dr. Philadelphia, and

NYCHHC.

Plaintiffs do not oppose the motion as to anesthesiologist Dr. Terbancea or neonatologist

Dr. Ahmad. Accordingly, the part of the motion seeking summary judgment in their favor is

1

**granted** without opposition, and all Plaintiffs' claims against Dr. Terbancea and Dr. Ahmad are dismissed. The vicarious liability claims against NYCHHC for the alleged acts and omissions of Dr. Terbancea and Dr. Ahmad are also dismissed.

Plaintiffs commenced this action on January 19, 2023, asserting claims of medical malpractice and lack of informed consent in connection with the labor and delivery of infant D.S. on June 28, 2022. Plaintiffs also assert claims for loss of services.

Prior to the events at issue, the Plaintiff mother had received prenatal care through the ob/gyn clinic at Kings County Medical Center, a NYCHHC facility. She was 36 years old and had four children, two born before 2005 and one delivered by c-section in 2018. She had delivered her last child by Vaginal Birth After C-section ("VBAC") in July 2021.

On May 27, 2022, Plaintiff was examined by ob/gyn Dr. Philadelphia at 33 weeks gestation. Dr. Philadelphia noted the mother's risk factors including her advanced maternal age, obesity, previous c-section, multiparity (multiple prior births), fibroids, short interval between pregnancies, and gestational diabetes mellitus. Dr. Philadelphia noted the patient was "counseled about Cesarean delivery vs TOLAC [trial of labor after cesarean]; risks/benefits d/w pt and she desires TOLAC."

On the evening of June 26, 2022, the mother presented to Kings County Medical Center with intermittent contractions and hypertension. She was admitted for induction of labor. Dr. Ricketts-Holcomb was the attending physician directing her care from approximately 10:30 a.m. on June 27, 2022. Dr. Ricketts-Holcomb ordered an intra-cervical balloon for cervical ripening, which was placed at 11:42 a.m.

Between 6:00 p.m. and 7:00 p.m., the mother reported pain at an "8" and vaginal pressure, and she was started on epidural anesthesia. A nursing note from 8:25 p.m. noted "pain,

2

[* 2]

vaginal bleeding, leakage of fluid." Plaintiff testified that the intra-cervical balloon had blood on it when it was expelled around 9:00 p.m.

Dr. Ricketts-Holcomb started the mother on Pitocin around 9:29 p.m. at 2 milli-units per minute. The dosage was increased every half hour. Dr. Ricketts-Holcomb testified that she turned over management of the patient to Dr. Philadelphia, the incoming attending ob/gyn, at 12:00 a.m. on June 28.

According to the medical record, there was a loss of contact in the fetal heart strips from 2:08 a.m. until 2:34 a.m., and additional instances of loss of contact through 2:51 a.m. Dr. Philadelphia examined the patient and reestablished contact. Dr. Philadelphia noted that the mother was receiving Pitocin at 20 milli-units per minute, but her contractions remained irregular.

The mother testified that she continued having abnormal and intense labor pains "for hours," and that she told nurses that "this is my fifth child and I know something is different." A nursing summary of care documented that at some point prior to 4:25 a.m., the patient had "complained of increase in labor, stated epidural is not working anymore," and she was instructed to use the "epidural pump clicker" and perform "deep breathing exercise."

The fetal heart monitoring strips documented loss of contact again at 4:04 a.m., and for an extended period from 4:13 a.m. through 4:29 a.m. Around this time, Dr. Ricketts-Holcomb returned to examine the mother and found there had been a loss of station. She called a c-section for suspected uterine rupture.

The "stat" c-section was called by Dr. Ricketts-Holcomb at some time between 4:25 a.m. (the "date of service" recorded by a nurse in the chart the following day) and 4:48 a.m. (the time noted as "procedure prep complete"), though the exact time is disputed by the parties. The

3

[* 3]

operative report notes that the c-section was performed by Dr. Ricketts-Holcomb with the assistance of Dr. Philadelphia. The procedure began at 5:02 a.m. and the infant D.S. was delivered at 5:05 a.m. She was apneic and limp at birth and had APGARS scores of 1/1/3. The infant was brought to the NICU and later transferred to Bellevue Hospital at 12:50 p.m. It is undisputed that she sustained hypoxic ischemic encephalopathy and was treated for multiple seizures in the hours after birth.

The infant D.S. spent the remainder of her life between hospitals, nursing homes, and at-home hospice care due to brain damage, additional seizures, and the need for 24-hour respiratory support. She passed away on April 27, 2023, at 10 months old.

Plaintiffs allege that Defendants Dr. Ricketts-Holcomb, Dr. Philadelphia, and NYCHHC departed from the standard of care by attempting VBAC labor and failing to timely order and perform a c-section. They also allege the mother was not properly informed of the risk of uterine rupture before consenting to VBAC and administration of Pitocin to induce or augment labor. They allege these departures proximately caused the uterine rupture, prolonged fetal compromise, and the infant's injuries including brain damage and death.

In evaluating a summary judgment motion in a medical malpractice action, the court considers the "essential elements" of medical malpractice: "(1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury" (*Miller-Albert v EmblemHealth,* 231 AD3d 1147, 1148 [2d Dept 2024] [internal quotation marks and citations omitted].) "Thus, a defendant moving for summary judgment must make a prima facie showing either that there was no departure from accepted medical practice, or that any departure was not a proximate cause of the patient's injuries. To meet that burden, a defendant must submit in admissible form factual proof, generally consisting of affidavits, deposition

4

[* 4]

testimony and medical records, to rebut the claim of malpractice." (*I.d.*) "If the defendant makes such a showing, the burden shifts to the plaintiff to raise a triable issue of fact as to those elements on which the defendant met its prima facie burden of proof" (*Delia v Wieder,* 236 AD3d 857, 858 [2d Dept 2025]). "Generally, summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions" (*Garcia v Hollander,* 241 AD3d 651, 653 [2d Dept 2025] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023]).

In support of their motion, NYCHHC submits an expert affirmation from Thomasena Ellison, M.D. ("Dr. Ellison"), a licensed physician board certified in obstetrics and gynecology.

Dr. Ellison opines that despite the mother's risks factors, "attempting a vaginal delivery was appropriate." In general, the expert states that a c-section poses "greater risks to both the infant and the mother" than vaginal birth. The expert also opines that allowing the mother a trial of labor/VBAC was justified, because after her 2018 c-section, she had successfully delivered another child by VBAC in 2021. The expert also opines that Cytotec was contraindicated to induce labor after a c-section, and therefore it was not administered. However, the expert opines that the use of Pitocin to "promote further dilation of the cervix" and "establish a regular contractions pattern" was in accordance with the standard of care.

The expert further opines that fetal heart monitoring was continuous and reassuring throughout the early part of the mother's labor, and there were no signs that a c-section was necessary. The expert opines that based on these reassuring fetal heart tracings, "allowing the mother to labor and deliver vaginally was the best choice over a C-section" and the

5

[* 5]

administration and titration of Pitocin was appropriate. The expert opines that the patient was "continuously monitored satisfactorily through electronic fetal monitoring," and the category I fetal heart tracings remained reassuring "from approximately 9:00 p.m. on June 27, 2022, to 4:00 a.m. on June 28, 2022."

The expert acknowledges that there was a loss of contact in the fetal heart strips between 2:04-2:34 a.m., then between 4:13-4:29 a.m. However, the expert opines that "each time contact was lost, continuous fetal heart rate monitoring was reestablished," and there was "no reason to perform a C-section at those times."

The expert notes that the mother's "first complaints of pain and vaginal pressure" were recorded at approximately 6:00 p.m., at which time she was examined by Dr. Ricketts-Holcomb. The expert states that the pain was well controlled with epidural placement until 4:00 a.m. the morning of June 28. The expert states that the patient began to complain of increased labor pain at 4:25 a.m., and an epidural bolus was administered at 4:40 a.m. by the anesthesiologist. The expert then states, "According to the fetal heart strips, there was a loss of contact at 4:48 a.m. The fetal heart rate monitoring could not be reestablished and was unobtainable at that time." The expert opines that Dr. Ricketts-Holcomb appropriately examined the patient and called for a c-section due to this loss of station and suspected uterine rupture.

The expert opines that "uterine rupture is an acute event and would not have been ongoing for several hours." Based on the medical records, she opines there was no evidence that the rupture was ongoing or recognizable prior to 4:48 a.m. She opines that the infant was delivered "within 20 minutes" based on the 4:48 a.m. stat order, which the expert opines was within the 30-minute standard of care. Therefore, the expert opines that no departure from the standard of care was a proximate cause of injury to the infant.

6

[* 6]

In opposition, Plaintiffs submit an expert affirmation from a licensed physician [name of expert redacted], board certified in obstetrics and gynecology. Plaintiffs presented a signed, unredacted copy of the affirmation to the Court for *in camera* inspection.

Plaintiffs' expert opines that it was a departure from the standard of care to allow the mother to proceed with a VBAC trial and induce labor with Pitocin rather than recommend and perform a c-section from the outset. The expert opines that VBAC should not have been considered an appropriate option due to her multiple high-risk factors, including "substantial uterine trauma from prior pregnancies, a prior c-section, a prior delivery less than one year before, advanced maternal age, a history of gestational hypertension, obesity, and uterine fibroid." Although some of these factors were present in the birth of her previous child in July 2021, the expert notes that the short interval between that birth and her current pregnancy (less than one year) was an additional risk factor. The expert further opines that her risk of uterine rupture would be elevated by induction or augmentation of labor with Pitocin. In light of her known history and her presentation on June 26, 2022, the expert opines that she was "not a safe candidate for VBAC" and the standard of care required a c-section. They opine that VBAC and augmented labor with Pitocin were contraindicated for a patient in these circumstances, and therefore the NYCHHC physicians deviated from good and accepted medical practice.

The expert also opines that Dr. Philadelphia and Dr. Ricketts-Holcomb failed to recognize the signs and symptoms of a developing uterine rupture and timely call for a c-section. According to the expert, these signs include "severe maternal abdominal pain, loss of fetal station, abnormal or nonreassuring fetal heart rate patterns, vaginal bleeding, and irregularity of uterine contractions." The expert opines that whenever a patient attempts VBAC, "any combination of these findings should immediately raise suspicion for uterine rupture and prompt

7

a stat cesarean." The expert opines that the mother's "escalating warning signs over many hours" included severe pain, vaginal bleeding, irregular contractions, and loss of contact of the fetal heart rate strips. The expert notes that her induction balloon was "visibly covered in blood" when it was expelled at 9:00 p.m., and the records and Plaintiffs' testimony reflect that she was in severe and abnormal pain throughout the evening of June 27. A progress note from 8:25 p.m. reflected she had pain and vaginal bleeding. Plaintiffs' expert opines that these symptoms, particularly combined with her known risk factors, should have led the physicians to cease the VBAC attempt and call for an emergency c-section.

In addition, there were repeated loss-of-contact readings on the fetal heart rate strips between 2:08 a.m. and 2:51 a.m. The expert opines that "repeated inability to maintain continuous fetal monitoring is itself a red flag requiring immediate physician assessment." The expert counters the opinion of the movant's expert that the fetal heart rate remained "reassuring" once contact was re-established, stating that "the fetus was effectively unmonitored during critical periods . . . during which the rupture was progressing."

Dr. Philadelphia examined the mother at 2:15 a.m. and noted irregular contractions and a plan for artificial rupture of membranes if the labor did not progress. The expert opines that Dr. Philadelphia departed from the standard of care by failing to consider the mother's signs of repeated loss of contact, pain, and bleeding and order an emergency c-section at that time. The expert also notes that the mother testified her pain worsened in severity despite an epidural. The expert opines that "her complaints were minimized" by nursing staff and physicians, rather than recognized as a sign of stress to her uterine wall and impending uterine rupture.

The expert states that the fetal heart strips began to document "nearly continuous loss of contact" beginning at 4:04 a.m., with no fetal heart tracings from 4:13 a.m. to 4:29 a.m. The

8

expert opines this represented "a catastrophic monitoring failure in a high-risk VBAC patient." Dr. Ricketts-Holcomb found loss of station on examination and called a stat c-section sometime after 4:25 a.m. for suspected uterine rupture. The expert opines this constituted a significant delay and departure from the standard of care, stating the c-section was only called "after hours of worsening symptoms, unrelenting maternal pain, vaginal bleeding, irregular contractions despite Pitocin, and prolonged gaps in fetal monitoring."

Finally, the expert opines that even once the "stat" c-section was called – which Plaintiffs contend was as early as 4:25 a.m., based on a nurse's "date of service" note – the physicians failed to perform it within the timeframe required by the standard of care. The expert opines that the "decision to incision" time for a stat c-section should be as expeditious as possible and should never exceed 30 minutes. The expert also notes that, based on the timeframe discussed by Dr. Ricketts-Holcomb in her own testimony, all the steps to prepare the patient, transfer her to the OR, and complete the c-section could and should have been performed within 10-18 minutes. Based on the earliest recorded time of 4:25 a.m., the expert opines the approximate 40-minute timeframe to complete the c-section delivery at 5:05 a.m. was "inexcusable and a clear deviation from good and accepted medical practice"

On proximate causation, the expert opines that these departures led to the mother's "catastrophic uterine rupture and the hypoxic-ischemic brain injury suffered by D.S." Had the physicians proceeded with a c-section from the outset, rather than attempting vaginal delivery and augmentation with Pitocin, the expert opines that the mother would have avoided "the excessive mechanical stress of labor on her compromised uterus" and she would never have sustained the uterine rupture, which in turn led to prolonged fetal deprivation of oxygen.

9

[* 9]

Similarly, the expert opines that an earlier c-section in the face of the mother's signs and symptoms of a "developing" or impending uterine rupture would have prevented the injuries.

The expert also opines that any delay between the uterine rupture, "stat" c-section call, and c-section delivery at 5:05 a.m. was a proximate cause of the infant's injuries, as "each additional minute that it takes to deliver the infant is a minute that the infant is deprived of oxygen, causing hypoxia to the brain."

Based on evaluation of both parties' submissions, the Court finds that clear issues of fact remain precluding summary judgment. Although the movant's expert has established prima facie entitlement to summary judgment on some issues, Plaintiff's expert addresses and rebuts each of these opinions.

One of the issues of fact raised by Plaintiff is whether it was a departure from the standard of care to attempt VBAC. Defendants' expert addresses the mother's risk factors, but she offers an opinion that these risks did not outweigh the general benefits of vaginal delivery over c-section, and she states that it was within the standard of care to attempt induction of labor. However, Plaintiff's expert offers a conflicting, well-reasoned opinion that VBAC was contraindicated from the time of her admission, and a c-section should have been recommended and performed.

Plaintiffs' expert also raises issues of fact as to whether the mother exhibited signs and symptoms as the labor progressed which required an emergency c-section, during both Dr. Ricketts-Holcomb and Dr. Philadelphia's shift. Plaintiff testified that she experienced abnormal pain for an extended period of time, which was only temporarily relieved by the epidural. The medical chart only reflects a flareup of pain prior to the epidural and after 4:00 a.m. The Court finds Plaintiff's expert opinions on this issue are non-speculative and supported by the mother's

10

testimony and the hospital record. Thus, there are issues of fact and credibility regarding her alleged abnormal complaints of pain and the response of the attending physicians. The Court also finds issues of fact as to the significance of the mother's vaginal bleeding, periods of loss of contact in the fetal heart strips, and loss of station, and whether these symptoms should have prompted an earlier emergency c-section.

Additionally, the Court finds there remain clear issues of fact as to the timing of Dr. Ricketts-Holcomb's "stat" c-section order after 4:00 a.m. Defendants' expert states that there was a "loss of contact at 4:48 a.m.," and there was no reason to perform a c-section before that time. Plaintiffs argue in opposition that a 15-minute loss of contact began at 4:13 a.m. and the fetal heart tracings were never reassuring after that point.

There are also conflicting notes in the medical chart as to exactly when Dr. Ricketts-Holcomb observed loss of station and made the decision to proceed with an emergency c-section. Defendant's expert states that the decision was made at 4:48 a.m. "as soon as the fetal tracing was lost," and "the infant was delivered [within] 20 minutes." However, there are other notes in the chart indicating the mother was already in the OR and prepped for the procedure at 4:48 a.m., which Dr. Ricketts-Holcomb testified would take several minutes. Plaintiff's expert opines that the c-section was called as early as 4:25 a.m., based on a nursing note detailing multiple events which was entered the following day. Based on the expert affirmations, testimony, and medical records, there are questions of fact and credibility as to the exact time of the c-section call, how much time elapsed before the infant was delivered, and whether it was timely performed in accordance with the standard of care.

On the issue of proximate causation, Defendants' expert opines that the uterine rupture was an acute event which occurred late in the delivery, shortly before the c-section was called,

11

[* 11]

and therefore no alleged departure from the standard of care was a proximate cause of the uterine rupture and the infant's resulting injuries. Plaintiffs' expert counters that the uterine rupture would have been avoided entirely if a c-section was called due to the mother's high-risk pregnancy and signs and symptoms during labor, and that the alleged delays in performing the c-section after the event proximately caused the infant's worsened injuries. These conflicting opinions preclude summary judgment as a matter of law.

In sum, the Court finds there are issues of fact as to the standard of care and proximate causation "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (*Stewart v. North Shore University Hospital at Syosset*, 204 AD3d 858, 860 [2d Dept 2022], citing *Russell v. Garafalo,* 189 A.D.3d 1100, 1102, [2d Dept. 2020]). Summary judgment is therefore denied as to the medical malpractice claims against Dr. Ricketts-Holcomb and Dr. Philadelphia.

Turning to the lack of informed consent claim, this is a distinct cause of action on which the plaintiff must ultimately demonstrate:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury" (*Figueroa-Burgos v Bieniewicz,* 135 AD3d 810, 811 [2d Dept 2016] [internal citations and quotation marks omitted]).

On the first element, the Second Department has held that:

> "[w]hile the signing of a generic consent form by the plaintiff does not establish that a defendant is entitled to summary judgment, a defendant can establish entitlement to summary judgment by demonstrating that the plaintiff signed a detailed consent form

12

[* 12]

after being apprised of alternatives and foreseeable risks" (*Pirri-Logan v Pearl,* 192 AD3d 1149 [2d Dept 2021] [internal citations omitted]).

Here, Defendant's expert opines that based on the record and the physicians' testimony, the foreseeable risks, benefits, and alternatives to VBAC in comparison with a c-section had been discussed with the mother prior to her signing a consent form. She specifically states that "the risks of elective repeat C-section were discussed, along with the advantages of C-section, including a decreased risk of uterine rupture." Additionally, the expert opines that the mother was properly informed of the "risks associated with labor induction agents" (Pitocin) and the potential need for an emergency c-section, which she also consented to.

The expert opines that in her appointment prior to admission, Dr. Philadelphia "appropriately and thoroughly counseled the plaintiff about the high-risk factors of her pregnancy," and that another NYCHHC physician, Dr. Grueso, "explicitly discussed the risks of VBAC" when she was admitted to labor and delivery. The expert states that these risks "included less than a 1% risk of uterine rupture with significant maternal and neonatal morbidity and mortality."

In opposition, Plaintiffs' expert rebuts these opinions as to whether the foreseeable risks of VBAC were disclosed to the mother prior to her signature on the consent forms. In her deposition testimony, the mother denied that she was ever informed of the risk of uterine rupture, and she did not recall any prior discussion of the risks of a vaginal delivery compared to a c-section. She testified that she was told by an admitting physician that "a vaginal delivery is best to do," and a c-section would be performed only "in case of any complications."

Plaintiff's expert further addresses the statement from the movant's expert that she was advised of a "less than a 1% risk" of uterine rupture. Plaintiffs' expert argues that if this small

13

[* 13]

likelihood was presented to her, it was inaccurate, because the "less than 1%" figure applies only to "healthy, low-risk VBAC candidates." Plaintiff's expert opines that the *foreseeable* risk of uterine rupture was higher for a VBAC with advanced maternal age, uterine fibroids, gestational hypertension, and short interpregnancy interval. The expert opines that the mother was "not fully or adequately warned of these heighted risks" at the time of admission or at any point during her trial of labor.

Based on the conflicting testimony and the opinions of the parties' experts, there are issues of fact on whether a foreseeable risk of uterine rupture and the benefits of a c-section over VBAC were appropriately disclosed to the mother before she consented to a trial of labor. Likewise, Plaintiffs raise issues of fact as to whether a foreseeable, increased risk of uterine rupture from administering Pitocin was disclosed to the mother. The Court therefore finds that issues of fact remain as to the first element of the lack of informed consent claim.

On the second element of the informed consent cause of action, Defendants' experts offer no opinion as to whether "a reasonably prudent patient in the same position" would still have undergone labor induction and VBAC if she had been informed of the risks. Thus, they have not established prima facie entitlement to summary judgment on that basis, and it remains an issue of fact for the jury.

Finally, there remain issues of fact on proximate causation with respect to the informed consent claim. This third element "is construed to mean that the actual procedure performed for which there was no informed consent must have been a proximate cause of the injury" (*Figueroa-Burgos v Bieniewicz,* at 811-812, quoting *Trabal v Queens Surgi-Ctr.,* 8 AD3d 555 [2d Dept 2004]). Here, Plaintiffs have raised issues of fact that informed consent was not

14

[* 14]

obtained for the VBAC and augmentation of labor with Pitocin, and that the uterine rupture and the infant's birth injuries were proximately caused by those treatments.

In sum, there remain triable issues of fact as to all the elements of the Plaintiffs' informed consent claim, and summary judgment on this cause of action must be denied.

Finally, the plaintiff mother and father assert a separate cause of action for loss of services of their deceased infant, "loss of the love, affection, support and companionship that a daughter ordinarily provides," and expenses for "medical and hospital care on her behalf."

"In New York, parents generally cannot recover for loss of consortium for their children," but they "may recover for loss of a child's services upon submitting proof that the child contributed to household income or paid a part of household expenses" (*S.M. v Madura,* 223 AD3d 486 [1st Dept 2024]). Parents also may recover for "reasonable expenses necessarily incurred . . . in an effort to restore the infant to health" (*Gilbert v Stanton Brewery,* 295 NY 270 [1946]; *see also Foti v Quittel,* 19 AD2d 635 [2d Dept 1963]).

Here, although there is no legally viable claim for loss of affection or society of one's child, the parents have a viable claim for pecuniary loss of services and medical expenses, to the extent such damages can be proved at trial. As there remain issues of fact as to the underlying medical malpractice claims, Defendants' motions are also denied with respect to the mother and father's derivative claims for pecuniary loss of services and medical expenses (*see Weiss v Vacca,* 219 AD3d 1375, 1378 [2d Dept 2023]; *Powell v Prego,* 59 AD3d 417, 418 [2d Dept 2009]).

Accordingly, it is hereby:

**ORDERED** that the part of the motion (Seq. No. 1) seeking summary judgment on behalf of Dr. Terbancea and Dr. Ahmad is **granted** without opposition, and the vicarious liability

[* 15]

claims against NYCHHC on behalf of Dr. Terbancea and Dr. Ahmad are dismissed; and it is further

**ORDERED** that the summary judgment motion (Seq. No. 1) of Dr. Ricketts-Holcomb, Dr. Philadelphia, and NYCHHC is otherwise **denied;** and it is further

**ORDERED** that the caption is amended to read:

```
---------------------------------------------------------------------------X
NATASHA SMARTT and DEVON SMARTT, as
Administrators of the Estate of D.S., Deceased, NATASHA
SMARTT, Individually and DEVON SMARTT, Individually,

        Plaintiffs,

  -against-

LISA RICKETTS-HOLCOMB, M.D., MELISSA
PHILADELPHIA, M.D. and NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION (KINGS COUNTY
MEDICAL CENTER),

        Defendants.
---------------------------------------------------------------------------X
```

The Clerk shall enter judgment in favor of GABRIEL TERBANCEA, M.D. and ASMA AHMAD, M.D.

This constitutes the decision and order of this Court.

ENTER.

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

16